THE case involved the question of devisavit vel non as to the paper writing purporting to be the last will and testament of George Dougherty, deceased, and came up at the preceding May term of this court on appeal from the Register of Wills in and for New Castle County, and was so entered upon the docket of the court and on the trial list of that term, but without any such issue or any other issue whatever framed and sent up with it by the register. On the case being called, however, and it so appearing, the counsel for the appellants informed the court that the paper writing purporting to be the last will and testament of George Dougherty, deceased, had been propounded by George Dougherty, his son, as the executor named therein, to the register of wills for probate and allowance, and there having been no caveat filed or objection raised against it by any one interested, the same had been probated before and allowed by the register in the manner and form usual in such cases, and letters testamentary had thereupon been granted by him to the said son, George Dougherty, as the executor of it. But in a few weeks after that a petition was presented to the register on behalf of the appellants, who deny that the said paper writing *Page 437 
is the last will and testament of the said George Dougherty, deceased, and claim that he died intestate, and that they are lawful children and heirs-at-law of his, for a review of the said proceeding, which was granted, and a hearing was thereon afterward had before him, and after hearing the parties and their witnesses and considering the evidence in the case, he affirmed the allowance of the will and granting letters testamentary in the case; before, however, he had announced his decision on the hearing of the petition for review, the petitioners by their counsel earnestly besought him to grant and award them an issue of devisavit vel non to try and determine the questions of fact presented in the case and the validity of the will depending thereon before a jury at the bar of this court, but which he declined and refused to award, and from his decision on that prayer of the petitioners and his judgment of affirmation they craved and took their appeal to this court.
The record sent up did not show that any prayer or application had been made by the petitioners to the register in the proceeding before him that he would award an issue of devisavit vel non at any stage of the case, or that any appeal had been entered or taken by them on his declining or refusing to award it, but as the statement of the facts made by their counsel in regard to the matter was not denied or contradicted by the counsel on the other side, the court, after consideration, concluded, as the constitution itself provides in very broad and comprehensive terms, that "The registers of the several counties shall respectively hold the register's court in each county. Upon the litigation of a cause, the depositions of the witnesses examined shall be taken at large in writing and make part of the proceedings in the cause. This court may issue process throughout the State to compel the attendance of witnesses. Appeals may be made from a register's court to the Superior Court, whose decisions shall be final. In cases where a register is interested in questions concerning the probate of wills, the granting letters of administration, or executors' or administrators' or guardians' accounts, the cognizance thereof shall belong to the Orphans Court, with an appeal to the Superior Court, whose decision shall be final."Con., art. 6, sec. 22. And as the right of appeal *Page 438 
from their decisions in the litigation of a cause before them is thus given to this court without any specification or qualification, we consider that it extends and applies to such a decision as was made by the register in this case on the application to him to award an issue of devisavit vel non made by the petitioners at that stage of the proceeding; and if we had any doubt on this point the concluding paragraph of the provision just read would be sufficient to satisfy us that the framers of it designed to include such a case in the construction and operation of it, for in the cases of which he has by law the sole original jurisdiction therein specially stated, cases and questions concerning the probate of wills are the first mentioned and are perhaps the first in importance. The statutory provision, chap. 89, sec. 4, Rev. Code 539, which provides that the register shall have power to order any issue of fact whereof he may prescribe the form, touching an instrument purporting to be a will, to be tried by a jury in the Superior Court, is a very old one in this State, and although it is not made expressly imperative upon him by the terms of it to order such an issue in any case, it was certainly not intended to be entirely dependent on his own option, or the constitution would not have given an appeal to this court from his decision on the application of either party for such an order in a case which had been heard and controverted before him to the extent this case had been, while the uniform practice in the register's court in each of the counties has been, so far as our knowledge extends, to order such an issue whenever applied for by either party, after a case concerning the probate of a will had been fully heard before him on a caveat filed against it before allowance, or on a petition for a review filed after allowance, and in such cases the safeguard against the abuse of the right of appeal will be found in the fact that but few, if any, would ask it after such a hearing before the register unless where the material facts in dispute were left on the evidence produced before him in such a doubtful and uncertain state as to render an appeal from his decision denying such an issue: in such a case both expedient and proper.
But in addition, to this when we consider that it is only by an issue: of devisavit vel non, well known in our practice, that the *Page 439 
legal validity or invalidity of a will, when depending on questions of doubtful and disputed facts and circumstances, can be ascertained and determined by the verdict of a jury, and is evidently contemplated and recognized in the provision of the statute referred to, as the proper method of determining them, we cannot come to any other conclusion than that it is our duty and within our province to take cognizance of the appeal in this case, notwithstanding the manner in which it has been brought into this court is wholly without precedent in our practice, but the excuse for that is that probably no case of the kind has ever before occurred in this State.
The next question presented was, How was the appeal in the case to be tried in this court? As usual in cases of appeal from his court to this, the register had sent up, with a complete record of the case before him, the testimony of the witnesses taken in writing before him on the probate of the will, and on which it had been allowed, and also the testimony of the witnesses taken in like manner on the hearing upon the petition for review; and as it had always been the practice in this court on appeals from a register's court to hear and determine them on the record and written testimony of the witnesses sent up by him without the intervention of a jury, it was contended on behalf of the appellee that this appeal must also be so heard and tried. But the court, after consideration of the question, concluded that as it was a novel and unprecedented case, and the appeal itself was a novel and peculiar one, although on a good and sufficient ground, that is to say, to the decision specially of the register refusing to order and award in the case an issue of devisavit velnon to be tried before a jury at the bar of this court on the application of the appellants in the register's court, the sole object of the appeal would be defeated, and the remedy and redress sought by it rendered wholly nugatory and void, unless an issue ofdevisavit vel non should be ordered by this court to be framed and tried before a jury at the bar of it on the trial of the appeal in this court. And accordingly such an order was made by the court, and the case was thereupon continued to this term. Heard at that term before Comegys, C. J., and Wootten and Houston, Judges. *Page 440 
And now at this term the case having been called and a jury impaneled and sworn to try the issue framed and ordered by the court, whether the paper writing in question and thereto annexed, purporting to be the last will and testament of George Dougherty, deceased, was or was not the last will and testament of George Dougherty, deceased.
Lore, attorney for the executor and appellee, then proceeded to prove the execution of the paper writing by George Dougherty as his last will and testament by the testamentary witness.
Robert C. Fraim testified that it was written by him and afterward signed in his presence by George Dougherty as his last will and testament, by making his written mark of the cross to his name, which he had written for him, as appeared at the close of it; and that he then, at the request of George Dougherty, signed it as a witness in his presence. It was written by him more than a year before that in his house or office in Wilmington. In February, 1876, George Dougherty, Jr., his son, called upon him and told him his father had sent him to him to get him to write his will. He asked him if he had any written memoranda for it; he said he had not, but his father had told him what he wanted to put into the will; and he drew the will from the verbal memoranda then given him by George Dougherty, Jr. In March, 1877, he again called on him and said that his father had been stricken with paralysis and wished to complete the will. They then drove out to his father's residence in Brandywine Hundred, went in, and as the day was cold he sat by the fire for a half hour, and during the time inquired of Mrs. Dougherty, George Dougherty, Jr., and Mrs. Weir about the physical and mental condition of the testator. He then went upstairs into the room, where he found him lying in bed, and then to his bedside and asked him if he knew him; he said he did, and mentioned his name. He then told him he understood he wanted to make his will; he said he did, and had sent George to get him to come out and do it. He then read the paper writing in question over to him in his hearing slowly and distinctly, and asked him if he heard it and understood it, and if that was his will and the way he wished to dispose of his property *Page 441 
by his last will and testament; to which he answered, yes, it was. Mr. James McDermott, the other subscribing witness to it, was then sent for, and after his coming into the room, and he, the witness, had written the name of the testator to it, they raised him up in a sitting position in bed, and placing it on the back of large book before him and the pen in his hand, he made his cross-mark on it, as appears in the signature to it, with his assistance in steadying and guiding his hand as he did it. He then asked him if he wished them (himself and Mr. McDermott), to sign it as witnesses; he said he did, and they then signed it as witnesses there in the room and in his presence. He believed then and still believed that he was at that time of sound, disposing mind and memory. That was done on the 22d day of March, 1877. On cross-examination, he said he had not seen George Dougherty for ten years before that time. He wrote his name to the will and the testator made his mark to it because he was then partially paralyzed and could not write.
James McDermott testified that he signed the paper writing in question as a witness by the request of George Dougherty and in his presence, on the day it bore date, March 22d, 1877, and saw him make his mark to his name written at the foot of it by Mr. Fraim, who drew it, and heard him say it was his will. He was not much acquainted with him, but he thought that he was at that time capable of making a will.
Whiteley, attorney for the appellants, then stated the grounds on which they denied the validity of it as the last will and testament of George Dougherty, deceased, and the first was that he was a man of near ninety years of age, had just suffered a severe attack of apoplexy or paralysis, and was too infirm both in mind and body on that day, which was the 23d instead of the 22d day of March, 1877, erroneously inserted in the paper writing by the draftsman of it at the time of the execution of it, and in the dispatch doubtless with which the whole thing was done by him at that late moment, and in the extremely critical and prostrate condition in which the old man then lay; and in the next place, that if he ever gave any verbal instructions to his son George to go to the draftsman of it to get him *Page 442 
to write a will for him from verbal memoranda of what he had told him to tell him he wanted him to put in it, such a will as was then written in such a manner and from such second-hand verbal instructions merely, and such a disposition of his property by last will and testament as appears in it, could only have been procured by the exercise of undue influence by his son George upon the mind of an aged and infirm father, even then too feeble to resist it.
His property consisted mostly of a farm in Brandywine Hundred, near the Pennsylvania line, containing a hundred and fifteen acres, worth a hundred dollars an acre, which he had bought when he was about fifty years old, and on which he resided up to the time of his death. He had seven children, four sons and three daughters, all of whom survived him except one, his son Samuel, who married and died in his lifetime leaveing children to survive him and also his father, with all of whom he had uniformly lived on good terms and treating them with like kindness and affection; and yet in this paper writing purporting to be his last will and testament he is made to cut off five of these children with a legacy of fifty dollars each, and the children of his son Samuel with a legacy of the same amount each, while he devises the whole of the farm to his wife for life, and on her death to his son, George Dougherty, in fee simple.
He proceeded to call and examine the witnesses for the appellants.
Dr. William Calver, sworn: Said he was a practicing physician of Booth's Corner, Delaware County, Pa., nearly five miles from where Mr. Dougherty lived; he visited him professionally on Thursday, March 22d; George Dougherty, Jr., came for him; it was between ten and twelve o'clock A. M. when he got there; he found the testator lying in bed in an unconscious condition; the only way you could tell there was any life in him was by his breathing and by a slight pulsation; he was suffering from an apoplectic attack; did not recover while he was there; should think from the symptoms that the attack was caused by an effusion of blood upon the brain; he gave him some aconite and chloride of potassa; he could not be aroused in any degree by efforts to awake him; volitional movement was entirely suspended; *Page 443 
he was lying like a log, motionless; his eyes were closed all the time he was there; did not expect him to recover when he left that afternoon; thought he would be dead in two hours' time; visited him the next day and found him then able to speak; did not think there was any permanent improvement in his condition then, although he could talk; saw him again on Sunday, April 1st; he was then lying unconscious; saw him again on Monday; he was still unconscious; this was his last visit; in his opinion this unconscious condition was the effect of apoplexy; he did not think when he saw him on the 22d of March he was capable of making a will or anything else, not even capable of taking a drink of water.
Cross-examined: At the first visit he was not in the room more than five minutes; did not think he was there on any occasion more than five minutes except perhaps on the last visit; on the first occasion he said to George Dougherty, Jr., "He may revive; if he does and you have anything to attend to you had better attend to it;" on Friday he articulated with a distinctness which showed marvelous recuperative power in one of his age; his comatose condition on the 1st of April was the result of another attack of apoplexy which occurred on the night before.
Re-direct: He only stayed five minutes on each occasion because there was nothing more he could do for the patient; that was ample time for him to examine into his condition and prescribe for him.
Dr. Joseph H. Chandler, sworn: He visited Mr. Dougherty on the last night of his life, April 5th, 1877; he died about four o'clock the next morning; he was dying at the time he saw him; where a man is stricken with apoplexy and remains in a state of profound coma for ten or twelve hours, recovery is very improbable; in a man of Mr. Dougherty's age, about eighty-eight, a comatose condition lasting for five or six hours would he thought in all probability preclude his recovery; from Dr. Calver's testimony he should not think Mr. Dougherty could have recovered by five o'clock on the afternoon of April 22d sufficiently to make a will.
Cross-examined as to the time in which a man in a comatose condition might recover the use of his faculties, the witness related *Page 444 
the case of his father, who was striken in a similar manner and at seven o'clock in the morning was perfectly unconscious. Under the influence of restoratives he had so far recovered by live o'clock P. M. as to be able to sit up, converse intelligently, and transact business.
Rev. Peter W. Hochkeppel, sworn: In 1877 he was the priest acting in place of Mr. Kelley, on Brandy wine; George Dougherty called for Mr. Kelley to go out and see his father; he went in his place; arrived at Mr. Dougherty's house between two and three o'clock in the afternoon; remained there between twelve and fifteen minutes; when he first saw Mr. Dougherty his momentary impression was that he was in a profound sleep; he did not know whether he or George roused him; at any rate, he tried to rouse him, and he was in doubt as to whether he was asleep or unconscious; he thought sometimes he had been asleep from the fact that when he was aroused he turned and spoke some words which gave him satisfaction and some which did not; he still had an idea that he was probably unconscious; he went there to give him the aid of the Church; his eyes were sometimes open and sometimes closed; the only thing George did that he could remember was that he tried to rouse him and tell him he was there; he did not think he asked him more than ten questions; some he answered satisfactorily, others he did not; could not say how many he answered; he gave him the rites of the Church; he was in doubt as to giving him the rites of the Church and gave him what is called "the benefit of the doubt;" that means this — the Church requires that the recipient should be in a proper state spiritually to receive the last sacraments, and in cases where the recipient is so far gone as to be unable to comprehend the questions addressed to him and cannot tell whether he is thus spiritually qualified, gives him the benefit of the doubt and administers the sacraments; at the time he did not think he could live long; he gave no answer more than "yes," or "no," but, before he left he recited a part of the Lord's Prayer after him; the last rites of the Church consist of prayer and the administration of the consecrated wafer; sometimes he thought he was really in articulomortis, that is, in immediate danger of death; George Dougherty took him home, and on the way he advised him that *Page 445 
if his father had any business to transact he had better have it attended to at once.
Cross-examined at considerable length.
Elizabeth Shelley, sworn: Was the widow of Samuel B. Dougherty, son of the deceased: the children of the testator were named William, Mary Ann, Jane, George, John, Catharine, and Samuel, all of whom survive except Samuel; she was married in 1852, and visited the testator more or less frequently from that time up to his death; her last visit was in January, 1877; was there from Wednesday till Monday on that occasion; he was in a very feeble condition so that he did not recognize her until Ms granddaughter had explained at considerable length who she was; at times his mind seemed all right but at other times he seemed very forgetful. Witness went on to detail the weak condition, mentally and physically, of the testator at that time, and of the manner in which George "bossed" things, showing a want of respect for the old man.
The witness, who at times during the examination seemed considerably agitated at how kindly the old man had treated her, related how, on one occasion, nine years before that, when her brother-in-law John was going away from home and the old man, much worried thereat, said: "He will never return; they have driven him away; they want to force me to make a will, which I never will, for one child is as near and dear to me as another, and Mary Ann is as good a child as ever a father raised." Witness explained that the reference to Mary Ann was because of some dissatisfaction that had arisen out of her second marriage.
Cross-examined by Mr. Lore: Mrs. Shelley said that the only act of authority she could recall that George, Jr., performed during her visit consisted in hauling a load of manure without consulting his father about it.
Annie McCollum, sworn: Witness visited the old man during his last illness; found him in bed very sick and apparently wandering in his mind; he spoke about having received a letter from Ireland which no one else was fit to read and asked her if she had been hunting rabbits lately; witness was not in the habit of hunting rabbits. *Page 446 
Mr. George Townsend was next called to testify that George Dougherty, Jr., had placed the farm in his hands for sale in November last. The farm is situated in Brandywine Hundred, about five miles from Wilmington, on the road leading from Concordtown to Naaman's Creek, contains a hundred and fifteen acres, according to this evidence, and he was authorized by George, Jr., to sell it at a hundred dollars an acre.
Mr. Whiteley closed here and the other side began to take testimony in reply.
Robert C. Fraim, recalled: After recapitulating his former testimony, Mr. Fraim said that when he arrived at Dougherty's house, between five and six o'clock on the afternoon of March 22d, he found there Mr. Dougherty and Mary Ann Green; he cautioned none of them to go out of the room, as he did not want the old man to be informed of his arrival, so that he might be better able to judge personally of his condition; when he went up-stairs he found the old man lying on his bed in the second story; George Dougherty, Jr., went up with him; he addressed him first; he said to him, "How do you do?" and extended his hand, which he grasped in his own; he then asked him if he knew him, he said, "Yes;" he asked him, "Who am I?" he said, "Mr. Fraim, do you think I don't know you?" he asked him if he had sent for him to write his will; he said, "Yes;" he then said to him, "I have had your will prepared for some time," and he answered, "Yes, I know that;" it was his right hand that was paralyzed; his left hand was not paralyzed because he bore his weight on it in raising himself in bed; he commenced to read the will to him and asked him if he read loud enough, and he said, "Yes, read on;" he suggested no alteration in the will; he gave an affirmative answer to the questions he asked him, nothing more; he read each item to him, asking at the end of each if that was his will, and he answered, "Yes;" he then asked him about the will as a whole and he made the same answer; he then told him they would require another witness, and the old man said, "George, you will have to go and get somebody," and George suggested a young man about sixteen or seventeen years old, named Reilley; he objected that he was too young and George then said he would get old *Page 447 
Mr. McDermott, to which he assented; they went down-stairs together and George went away and returned in about twenty minutes with young Mr. McDermott; they then went up-stairs and he asked the old man if he could get up and sign the will, and he said he thought he could and asked George to assist him to sit up; George and he helped him up in bed and he laid this document on a book so as to be convenient to sign, and asked, "Is that your last will and testament?" he replied, "Yes;" he asked, "Is it by your request that Mr. McDermott and myself become witnesses to it?" he said, "Yes;" he then put the pen in his hand and guided his hand while he affixed his mark; from his observation of him at the time and his previous acquaintance with him he believed he was of sound disposing mind and memory; he had no doubt whatever as to his testamentary capacity or he would not have allowed him to sign.
Lore then offered in evidence the deposition or testimony in writing of the witness, James Reilley, taken before the register on the hearing before him on the petition for review in the case, who was in the service of George Dougherty, deceased, when the paper writing in question was executed, but could not now be found in the county or State, and whose place of residence could not be ascertained. The last heard of him was that he had since joined a band of wandering gypsies and left the State for parts unknown. He cited in support of it 1 Grenl. Ev., sec. 163.
Whiteley said the question presented had been decided differently in several of the States. If this had been a case tried at a former term of this court, a judge's notes of his testimony at that term might, under the circumstances, be read to prove what it was, if the witness had died in the meanwhile; but in the case before the court, the witness still being alive, and it being before the jury on an issue from the court, and not from the register, it was not admissible in evidence. 6 Cow. 162.
By the Court: The case is now before us on appeal from the register, and as required and provided by the constitutional provision which we have before referred to in the litigation of the *Page 448 
case before him, this testimony of the witness named was reduced to writing, and together with the testimony of all other witnesses, in writing also, saw set up with the appeal, and as it makes part of the proceedings in the case, it is of course now before this court on the appeal, and may be read in evidence to the jury. But it might be addmitted to be read in evidence, iydependent of that provision, on the general principle that it was testimony reduced to writing taken in this same case between the same parties on the former hearing of it before the register. 1 Greenl. Ev., seces. 163, 553.
It was then read to the jury and was to the effect that the old man knew and understood what he was doing when the paper writing was executed.
Robert Burgie, sworn: He had been acqainted with George Dougherty for about two years before his death, and was at his house a good deal during that time, and his conversation was mostly with him when he was there; the last time he was there was about six months before his death, and he was then capable enough of making a will; he is a nephew of his widow, Mrs. Dougherty.
John Forwood, affirmed: Knew George Dougherty from the time he bought and moved, till he died on his farm, in Brandy-wine Hundred, or about forty years. After his son John moved on his farm adjoining that, he told me that he had offered to sell it to him for a thousand dollars, but he wanted his son George to have the farm he then lived on; that was about a year before his death.
George Lutz, sworn: Was acquainted with George Dougherty and was frequently there; the last time was a week before Christmas in 1876, and talked with him a good deal while he was there on that occasion; he was sound enough in mind and memory then to make a will.
Thomas Wiggins, sworn: He lived with and worked for George Dougherty as a farm hand four years up to the week before Christmas before he died; during that time the old man worked a good deal about on the farm in different ways until he got tired, and then he would quit. *Page 449 
Several witnesses were then called on the other side who impeached the character of George Reilley for veracity in the usual method.
In the argument of the case Lore asked the court to instruct the jury: 1, what constitutes a sound disposing mind and memory in contemplation of law; 2, that every person of lawful age who executes such an instrument is presumed to possess a sound disposing mind and memory until the contrary appears and is satisfactorily shown to the minds of the jury called to decide the question; 3, that that question and inquiry pertains and relates to the precise time of the making and execution of the will; 4, that the testimony of the subscribing witnesses to the will is entitled to peculiar weight upon that question in the consideration and determination of it by the jury, and cited Chandler and Others v. Ferris, 1Harr. 454, in which the court charged the jury that if they were of opinion from the evidence that the testator was capable of exercising thought and judgment and reflection, if he knew what he was about and had memory and judgment, his will could not be invalidated on the ground of insanity, which was one of the grounds on which the validity of it was assailed in that case. Neither could it be set aside on the ground of undue influence unless such influence amounted to a degree of constraint such as the testator was too weak to resist; such as deprived him of his free agency, and prevented him from doing what he pleased with his property. Neither advice nor argument nor persuasion would vitiate a will made freely and from conviction, though such will might not have been made but for such advice and persuasion. Duffield v. Morris'Exr., 2 Harr. 375, in which the court said to the jury that reason being the common gift of God to man raises the general presumption that every man is in a state of sanity until the contrary is proved; every man, therefore, of full age has the right to dispose of his property by will, unless he can be shown to be insane, noncompos mentis, of unsound mind, or wanting what is called a sound disposing mind and memory. A sound mind is one wholly free from delusion, all the intellectual faculties existing in a certain degree of vigor and harmony; the propensities, affections, and passions being under *Page 450 
subordination to the will and judgment, the latter being the controlling power, with a just perception of the natural connection or repugnancy of ideas. Weak minds again only differ from strong ones in the extent and power of their faculties; but unless they betray symptoms of a total loss of understanding or of idiocy or of delusion they cannot properly be considered unsound. A perfect capacity is usually tested by this, that the individual talks and discourses rationally and sensibly and is fully capable of any rational act requiring thought, judgment, and reflection. This is the standard of a perfect capacity; but the question is not how well a man can talk or reason, or with how much judgment he can act, or with how great propriety and sense he can act; it is only, has he mind and reason? can he talk rationally and sensibly? or, has he thought, judgment, and reflection? Weakness of mind may exist in many different degrees without making a man intestable. Courts will not measure the extent of people's understandings or capacities if a man be legally composmentis. Be he wise or unwise, he is the disposer of his own property, and his will stands as the reason for his actions.
Again, in the case of Sutton v. Sutton et al., 5Harr. 459, the court said to the jury that the testable capacity of such a person as the testator in that case, of whom insanity was not supposed, would amount to nothing more than a knowledge of what he was about when he made the will, and how he was disposing of his property and the purpose so to do it; and as to undue influence over a man of testable capacity, it must be such as to take away his free will such as he is too weak to resist. Mere solicitation will not be sufficient to vitiate a will made by a person having a knowledge of what he is doing and intending to do it when making it, though his act may be brought about by solicitation or that kind of influence which a disposition to gratify another may produce. But if from age or inbecility a testator could be induced to change his will contrary to his intentions and against his own wishes, that would be undue influence, and its effect upon a doubtful or fluctuating capacity would invalidate the will. On all these points the age and bodily condition of the testator, his condition and circumstances, his known affections *Page 451 
and preferences, and the correspondence or contradiction of the will to these affections, the manner of making or altering the will, the persons around him at the time, their capacity and credibility, are all facts to be considered.
In the case of Cordrey v. Cordrey, 1Houst. 269, the court charged in substantially the same terms and that, the formal execution of the will being established, the presumption of law is in favor of the capacity of the testator to make it, and in the case of Lodge's Will, 2 Houst. 418, the court charged that if the jury were satisfied from the evidence that the testator signed the paper writing knowing it to be his will, and the witnesses to it attested and subscribed the same in his presence, the will was duly executed and must be recognized to be a valid will, unless he was mentally incapable of making a will or unless undue influence was exerted over his mind to such an extent as to procure a disposition of his property to be made contrary to his real wishes. Every person is presumed in law to be of sound mind until the contrary is shown, and the burden of showing an unsound mind in the testator rests on the party contesting the validity of the will, and the testimony must relate to the time of its execution. Mere weaknesses of mind or partial imbecility from disease of the body or from age will not render a person incapable of making a will. A weak or feeble-minded person may make a valid will, provided he has understanding and memory sufficient to enable him to know what he is about and to whom he is disposing of his property. If, therefore, the testator at the time of executing the will, was capable of exercising thought, reflection, and judgment, knew what he was doing and how he was disposing of his property and had sufficient memory and understanding to comprehend the nature and character of the transaction, he was capable of making a will. Undue influence must be such an influence exerted over the testator's mind as to take away or destroy for the time his own free will, and must be such an influence obtained either by flattery, excessive importunity or threats, or in some other mode by which such a dominion is acquired over the will of the testator as to overbear and destroy his free agency and constrain him to do against his free will what he is unable to refuse. But *Page 452 
that influence which is acquired by modest persuasion or by arguments addressed to the understanding or by mere appeals made to the affections of the testator, does not in contemplation of law amount to undue influence, or such influence as will invalidate a will.
And in the case of Jamisons Will, 3 Houst. 108, the court again charged to the same effect and in terms even still more particularly applicable to this case. In that case it said the question of a testator's capacity to make a will is to be decided by the jury solely by the facts which the testimony in the case discloses. And upon that question the opinions of the subscribing witnesses to the will, if they are persons of intelligence and veracity, are entitled to great weight. Intellectual feebleness alone, or mere weakness of the understanding, or a partial failure of mind or memory, or even a failure of mind or memory to a considerable extent, whether it be natural or the result of an injury or of disease, or arises from an attack of apoplexy or paralysis, or from any other cause, is not of itself a sufficient ground for setting aside a will if there still remains sufficient mind and memory to enable the testator to comprehend and understand what he is doing. If he is able to understand that he is disposing of his estate by his will, and to whom he is disposing of it, however weak his intellect may be he is able and competent to make a will. The question is not so much as to the degree of mind or memory possessed by the testator, as this, Was he capable of recollecting what property he was disposing of and to whom he was disposing of it? In a word, were his mind and memory sufficiently sound to enable him to know and understand the business in which he was engaged at the time when he executed the will? If they were, then he was capable of making it, and it was his will.
Whiteley, in reply, simply cited Swinburn 72 and 3Stark Ev. 1703. The authorities on the subject state that no person who is non compos can make a will, and the term comprehends not only idiots and lunatics, but all other persons who from natural imbecility, disease, old age, or other such causes are incapable of managing their own affairs. The words mean the same with *Page 453 
the English words "of unsound mind." An old man become childish or so forgetful as not to remember his own name cannot make a will; and, accordingly, to make a will valid it is not enough for the testator to have had memory sufficient to answer familiar and usual questions, but he must have had a disposing mind so as to have been able to make a disposition of his estate with understanding and reason. Swinburn observes that "the same memory for making a will is not at all times when the party can speak yea or no, and hath life in him, but he ought to have judgment to discern and be of perfect memory, otherwise the will is void," and therefore the evidence ought to go to this extent.
The Court,
charged the jury at length on all the points of law presented in the case, and on which he was requested to charge them by the counsel for the appellee, in conformity with the rulings in the cases cited by him, and the jury returned a verdict that the paper writing in question was not the last will and testament of George Dougherty, deceased.